*259 OPINION OF THE COURT
Nicholas Figueroa, J.
In this CPLR article 78 proceeding, a medical doctor seeks to set aside a determination by the State Medicaid Inspector General (the Medicaid IG) denying her application to be reinstated as a provider in the Medicaid program. The Director of the State Office of Professional Medical Conduct (OPMC) has also been joined as a respondent in this proceeding. Both respondents hold positions as bureau heads within the State’s Department of Health. The IG’s denial of petitioner’s application, however, effectively bars petitioner from a work venue specifically contemplated as available to her under a prior settlement with the Director.
Petitioner, a 1990 emigré from Rumania, is licensed to practice in New York and is board-certified in psychiatry and neurology. Between 1990 and 2003, she was employed by hospitals in the greater New York area and at the end of that period was an attending physician in an outpatient clinic at Metropolitan Hospital. At the beginning of 2004, however, one of her patients filed a complaint against her with the State Department of Health. The Department referred the complaint to OPMC for investigation and possible disciplinary proceedings by the Board of Professional Medical Conduct (Board). Petitioner resigned from her position at Metropolitan Hospital shortly after the complaint against her was filed. Two months later, she joined the medical staff of St. Joseph’s Medical Center, a community hospital in Yonkers, where she continued to work for the next 2V2 years. During that time, the OPMC investigation of her case continued.
In late December 2006, petitioner, OPMC, and the Bureau of Professional Medical Conduct (the Board’s legal department) executed a “Consent Agreement.” Under the agreement, petitioner, who was then represented by counsel, waived her right to contest OPMC’s formal charges, which alleged that she had committed “boundary violations” involving two patients, including “inappropriate sexual contact” with one of them. Further, the parties agreed to a 12-month suspension of petitioner’s medical license, as a “penalty.” They also agreed that, at the end of the 12-month period, reactivation of her license would be subject to her meeting specified “conditions,” including her completion of “a continuing education program in the area of physician-patient boundaries” and her submission of “a current, independent, in-depth psychiatric evaluation by a board- *260 certified psychiatrist. . . pre-approved by the Director, showing that she is fit and clinically competent to practice as a physician.” It was further agreed that petitioner would be subject to, among other things, the following conditions for a period of 60 months after her license was reactivated:
“Unless determined and pre-approved otherwise by the Director of OPMC, [petitioner] shall work only in a supervised setting, such as a facility licensed by New York State, where close practice oversight is available on a daily basis and where quality assurance and risk management protocols are in effect. [Petitioner] shall not practice medicine until the supervised setting proposed by [petitioner] is approved, in writing, by the Director of OPMC.”
The terms of the agreement were adopted by the Board in a consent order dated January 8, 2007.
Following its standard practice, early in 2007 OPMC gave notice of the agreement and order to various state and federal agencies, including the Medicaid IG. In view of the license suspension, the IG automatically terminated petitioner from participation as a Medicaid provider pursuant to Department of Health regulations (18 NYCRR 504.7 [d] [1]). The IG twice sent petitioner notice of this action. The second such notice apparently was prompted by a letter sent in early June 2007 by the U.S. Department of Health and Human Services, advising the IG that petitioner had been excluded from enrollment as a Medicare provider in view of the license suspension and directing that the IG take parallel steps on behalf of the Medicaid program pursuant to 42 USC § 1320a-7 (Social Security Act tit XI).
Just before the end of the 12-month license-suspension period, the report of an independent psychiatrist was sent to OPMC, as required under the agreement. The psychiatrist based his evaluation of petitioner on seven interviews as well as his review of the details of her case. The report ended by noting,
“Considering that [petitioner] had functioned as a psychiatrist for over two years after the ‘incident’ without any problems and she has had for the last year some beneficial psychotherapy, and after evaluating her good grasp of the psychodynamic of her past emotional difficulties related to the ‘incident,’ I believe that she is ready and able to function now as a licensed physician.” *261 This report substantially confirmed the substance of another from a mental health professional retained by petitioner.
When her license was reactivated, petitioner made arrangements to return to St. Joseph’s staff as a physician in an inpatient unit under supervision and protocols consistent with the strictures of the agreement. The proposed terms of her employment were approved by OPMC.
At the same time, petitioner applied for reinstatement in the Medicare program, and her application was granted. By a separate application, she also sought reinstatement in the Medicaid program.
By letter dated June 12, 2008, however, the Medicaid IG denied her application for reinstatement. The letter advised petitioner that “[although, [sic] your license is active, the causes that lead [sic] to your license being suspended is [sic] sufficient reason for this Agency’s decision to deny your application.” The letter further advised that petitioner could not submit a new application for at least two years from the letter’s date, but that she could, within 45 days of such date, seek reconsideration. Petitioner applied for reconsideration, but a responsive letter dated September 12, 2008 notified her that the IG affirmed his original decision and that such action constituted his “final determination.” Petitioner commenced the instant proceeding on December 30, 2008.
It appears undisputed that the denial of petitioner’s application to be reinstated in the Medicaid program was responsible for the loss of her job at St. Joseph’s. Indeed, respondents do not deny petitioner’s assertion that, under Medicaid regulations, her continuing exclusion from the roster of Medicaid providers effectively bars any governmentally licensed or operated facility from hiring her. Petitioner has remained unemployed and claims that the challenged determination as a practical matter prevents her from working as a physician. To be sure, respondents contend that she could possibly find work in some private practice that might be able to accommodate the close supervision and protocols required under the agreement. Petitioner disputes that contention as unrealistic, if not disingenuous. In any event, there is no dispute that a prime avenue of employment contemplated in the agreement — “a facility licensed by New York State” — has been effectively closed to petitioner by the Medicaid IG’s action.
As will be seen below, the foregoing facts implicate legal issues of first impression.
*262 The threshold legal question concerns respondents’ argument that this proceeding is time-barred under CPLR 217 (1), requiring that an article 78 proceeding be brought within four months of the petitioner’s receipt of the agency’s final determination (90-92 Wadsworth Ave. Tenants Assn. v City of N. Y. Dept. of Hous. Preserv. & Dev., 227 AD2d 331 [1996]). In this connection, respondents base their calculation of untimeliness upon the IG’s 2007 notices to petitioner that she was being excluded from participating in the Medicaid program in view of her license’s suspension. Petitioner does not, however, purport to be challenging that initial exclusion. Her challenge is, instead, to the final determination denying her reinstatement in Medicaid, as announced by the Medicaid IG in his September 12, 2008 letter. Her filing of the instant petition on December 30, 2008 was therefore timely.
We thus arrive at the substantive issues. At least one governing principle is well established: where, as here, an article 78 petitioner asks the court to set aside an agency’s discretionary action, the court may do so only if the challenged action is arbitrary and capricious or lacks a rational basis (see Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]). This does not happen often. To establish whether this matter is one of the infrequent cases in which the demanding standard for relief is satisfied, it is necessary to trace the history and content of statutes and regulations that bear upon respondents’ respective administrative functions and upon their relationship to the Department within which they operate.
In the mid-1970s, the state legislature transferred from the Department of Education to the Department of Health responsibility for overseeing the professional conduct of medical doctors (L 1975, ch 109). The Board, with a majority of its members required to be physicians, was created at the same time specifically “ ‘to improve procedures for the professional discipline of physicians’ ” (Roberts v Gross, 100 AD2d 540, 541 [1984], quoting 1979 Ops Atty Gen 51; Public Health Law § 230 [1]). Since then, OPMC and the Board have served, respectively, as the Department of Health’s investigatory and adjudicatory arms concerning allegations of professional misconduct by physicians (Education Law § 6509; Public Health Law § 230 [1]).
In 1996, some 30 years after Medicaid’s inception, the legislature reposed in the Department of Health the responsibility for administering Medicaid, in place of the Department of *263 Social Services (L 1996, ch 474). As amended, section 363-a (1) of the Social Services Law directed that “[t]he department of health shall . . . act as the single state agency to supervise the administration of [Medicaid] in this state” and further directed that all of the statute’s references to “the department” should be understood to mean the Department of Health (L 1996, ch 474, § 233). As an incident of such responsibility, the Department of Health became subject to Medicaid regulations previously promulgated by the Department of Social Services, including provisions governing enrollment of providers (18 NYCRR part 504) and sanctions and reinstatement (18 NYCRR part 515).
The position of Medicaid IG as it now exists was not established until 2006. In August 2005, in the wake of a series of newspaper articles reporting that widespread fraud and waste had cost the State billions of dollars annually, the Governor issued Executive Order (Pataki) No. 140 (9 NYCRR 5.140), which announced the creation of a Medicaid IG within the State’s Executive Department (Lytle, Meet the State’s Brand New Medicaid Fraud Legislation, NYLJ, July 10, 2006, at 9, col 1). The mandate of this new state officer was to review the structure and operations of the State’s program and to recommend ways to “improve efforts to control fraud, waste and abuse” (9 NYCRR 5.140). Six months later, superseding Executive Order (Pataki) No. 140.1 (available following 9 NYCRR 5.140) removed the Medicaid IG from the Executive Department and defined his office as “an independent fraud-fighting entity within the Department of Health” whose central mission was to “prevent[ ] Medicaid fraud, waste and abuse.” Only a few months after that, the legislature enacted title III of article 1 of the Public Health Law (effective as of July 26, 2006).
The new statute borrowed heavily from the later Executive Order’s terms. Among other things, it expressed the legislature’s intent to “establish[ ] an independent office of Medicaid inspector general within the department [of health]” who would streamline “the [S]tate’s process of detecting and combating Medicaid fraud and abuse and maximize the recoupment of improper Medicaid payments” (Public Health Law § 30). It reaffirmed that
“the department [of health] is the single state agency for the administration of [Medicaid] in New York [S]tate, provided that the office [of the Medicaid IG] shall undertake and be responsible for the *264 department’s duties as [such] single state agency with respect to: (a) prevention, detection and investigation of fraud and abuse within [Medicaid]; (b) referral of appropriate cases for criminal prosecution; and (c) recovery of improperly expended [Medicaid] funds. Such responsibility shall include, but not be limited to, [Medicaid] audit functions, . . . and the function of [Medicaid] fraud and abuse prevention” (Public Health Law § 31 [1]).
The statute provided that the Medicaid IG was to be appointed by and serve at the pleasure of the Governor (Public Health Law § 31 [2]) and specified as the prerequisite to such appointment at least 10 years’ experience in fraud investigation or auditing or in the profession of law involving some prosecution or “consideration” of fraud; or some comparable experience in the area of health care or senior management, with the proviso that such comparable experience involve “some consideration of fraud” (id.). The statute further provided for “the transfer of the [Medicaid] audit and fraud and abuse prevention functions from the department [of health]” to the IG’s office (Public Health Law § 34). The statute authorized the IG, among other things, to “solicit, receive and investigate complaints related to fraud and abuse within [Medicaid]” (Public Health Law § 32 [4]); “to pursue civil and administrative enforcement actions against any individual or entity that engages in fraud, abuse [and, as recently amended, illegal or improper acts or unacceptable practices]” (Public Health Law § 32 [6]); and to “exclu[de] . . . providers . . . from participation in the program” (§ 32 [6] [d]). Moreover, the statute directed that, for the sake of “prevent[ing], detecting] and investigating] [Medicaid] fraud and abuse,” the IG work toward “coordination] . . . amongst the . . . department [of health] . . . and [other appropriate entities]” (Public Health Law § 32 [3], [18]).
The parties’ arguments in our article 78 proceeding rely on their respective views of the scope of the Medicaid IG’s power to determine whether a provider may participate in the Medicaid program where the basis for exclusion is professional misconduct.
The Medicaid IG points out that the applicable statutes and regulations authorize him to refuse to reinstate a Medicaid provider, and he contends that the terms of the agreement do not constrain him to do otherwise in petitioner’s case. His argu *265 ment is, in effect, that his authority to exclude physicians from enrollment as Medicaid providers includes the power to determine independently which providers would pose a threat to the health and safety of Medicaid patients.
The expansiveness of the Medicaid IG’s view of his authority is best appreciated by contrasting the determination now at issue with the agreement upon which he avowedly based that action. As indicated above, the agreement’s reference to a state-licensed facility clearly was intended to illustrate the type of work venue in which petitioner could work once her license was reactivated, a proposition that would have been meaningless if petitioner would not at that point be allowed to participate in the Medicaid program. Moreover, implicit in such reference was the Department of Health’s conclusion that, with the specified conditions in place, petitioner’s return to work in such a facility would not present a reasonably foreseeable danger to the health and safety of patients. Accordingly, the IG’s decision to deny petitioner reinstatement tacitly reflects his assumption that he is authorized to assess whether a physician would be an asset or detriment to patients in the Medicaid program based upon the physician’s past and anticipated future professional conduct even where his conclusion is inconsistent with a prior assessment by OPMC and the Board.
Petitioner for her part argues that the legislature intended the Medicaid IG to investigate and be the arbiter of only such matters as directly relate to the Medicaid fisc, such as cases involving auditing, accountancy, pursuit of fraud in its technical sense, unnecessary prescriptions for medical services, testing, or drugs, and the like. In other words, she maintains that the IG’s function does not include independently assessing a provider as a professional per se.
The applicable statutory and regulatory provisions do not establish which of these competing views of the Medicaid IG’s role is correct. Indeed, the regulations were written and last amended well before the IG’s office was created, and they are therefore not natural sources of light by which to locate the jurisdictional boundaries in question here. Thus, although an application for reinstatement as a Medicaid provider is unquestionably subject to consideration of factors “having a direct bearing on the applicant’s ability to provide high-quality medical care” (18 NYCRR 504.5 [a] [13]), the regulations do not indicate whether the IG is to consider such factors himself or instead is to depend upon others in the Department of Health *266 to do so, i.e., the units whose long-time function and expertise are in the areas of professional conduct and patient protection.
As for the Public Health Law provisions that created the office of Medicaid IG, they may be read as arguable support for either of the parties’ competing views of the IG’s role in a case such as this. Nor does the legislative history provide a definitive answer to this question. Moreover, there is no prior judicial decision addressing, much less resolving, such issue. However, certain practical considerations suggest that the IG’s authority necessarily falls short of what he proposes.
The instant proceeding illustrates the point. Here, the Department of Health, through OPMC and the Board, was indisputably responsible for protecting non-Medicaid and Medicaid patients alike by determining whether their health and safety could be entrusted to petitioner’s care, and, if so, on what terms. Given the obvious importance of avoiding duplicative departmental work and potentially inconsistent intra-departmental results, the legislature did not likely intend that the Medicaid IG in such a case might second-guess the Department by also investigating or evaluating whether the physician in question would present a potential danger to a subset of the patient population, i.e., Medicaid recipients. The IG was likelier meant instead to defer to the conclusions of his sister departmental units in such regard.
It is noted, however, that in this case the Medicaid IG did not purport to investigate or independently evaluate petitioner. Indeed, respondents do not claim that the IG’s determination was anything other than an automatic denial based on the content of the agreement. To be sure, the agreement contained petitioner’s concession that she would not contest the two charges against her. But it also in effect contained, as noted above, the Department’s conclusion that, after the 12-month penalty, she could safely be returned to hospital employment under the stipulated conditions. In the face of such acknowledgment by departmental staff who had directly and at length been involved in the review of petitioner’s case, the IG’s perfunctory refusal to reinstate petitioner — thus hampering her return to such employment — was baseless. In other words, it was arbitrary and capricious. The same adjectives might be applied to the IG’s apparent belief that petitioner could be passed from one bureau “within” the Department to another for serial dispositions reflecting inconsistent resolutions of the same core question of patient health and safety. Indeed, such a notion *267 runs counter to the agency “coordination” that the legislature set as an operative theme for the IG (see Public Health Law § 32 [3], [18]).
In view of the foregoing, which moots petitioner’s alternative request for relief against OPMC, there is no need to decide whether such request is, as respondents argue, premature. Instead, it is adjudged that, for the reasons discussed above, article 78 relief is warranted in this case, and the petition therefore is granted to the extent that it seeks relief against the IG. The challenged determination is hereby annulled, and the IG is directed to reinstate petitioner forthwith to the roster of Medicaid providers.